Sam B. MARTIN, Appellant,

v.

DAVIS CONSTRUCTORS, INC., et al., Appellees.

No. 15699.

Court of Civil Appeals of Texas, San Antonio.

May 25, 1977.

Rehearing Denied June 29, 1977.

R. L. House, House, Mercer, House, Brock & Wilson, San Antonio, for appellant.

William C. Church, Jr., Kampmann, Church & Burns, Charles P. Haymore, San Antonio, for appellees.

KLINGEMAN, Justice.

This is a suit by plaintiff, Sam B. Martin, against T. E. Davis, Davis Constructors, Inc., Ed Davis, Inc., and Dacom, Inc. for monies allegedly due under two letter agreements. Plaintiff sued for $2,186.21 under a letter agreement dated January 1, 1973 and for $85,219.32 under a letter agreement dated June 11, 1973, as amended on January 11, 1974. Trial was to a jury, and based upon the jury's findings to various special issues, judgment was rendered for plaintiff against T. E. Davis in the amount of $41,886.85, and that plaintiff take nothing against the other defendants.

In answer to the pertinent special issues here involved, the jury found:

1. Plaintiff was not entitled to any additional compensation for the Victoria Toll job.

2. It was the intention of plaintiff and defendant to deduct overhead in arriving at the percentage of net profits on the jobs under the June 11 letter agreement.

3. The jury found 33 items (out of 35) to be necessary overhead expenses in connection with the jobs covered by the June 11 agreement. The jury disallowed expenses for "bad debts" and "partnership losses."

4. The usual and customary method of computing the percentage of overhead to be charged to a job in the commercial construction business is to divide the total overhead by the total direct job cost during a given period of time.

5. The jury made findings as to the total direct job cost on all jobs during the covered period; and on each job individually, the total income and total direct cost of such job.

Prior to January 1, 1973, Sam B. Martin and T. E. Davis had an oral agreement under which they operated which was reduced to writing by a letter agreement dated January 1, 1973. This is a letter from T. E. Davis to Sam B. Martin, of which the material portions are as follows:

. . . I have agreed to furnish bonds, financing, bookkeeping, tools and equipment that I have available and any other items of material and home office labor that I would normally furnish any other job.

You have agreed to furnish estimating to obtain the job, except where I wish to estimate the job and then turn it over to you, and all general supervision to complete the job just as you would if you were doing the job as a completely independent contractor.

We will divide the profits of the job on the following basis: the first 3% will go to me, the remainder to you up to a total of 6%. Any profit over 6% will then be divided equally between us.

Any deviation from the above may be agreed upon at any time on an individual job basis.

On June 11, 1973, a changed or new letter agreement was entered into. This is also in the form of a letter by Davis addressed to Martin. The pertinent portions of this letter may be summarized as follows:

You will assume complete responsibility for all supervision of jobs.

You will be paid a salary of $20,000.00 per year and a percentage of net profits on jobs of 20%. [on jobs handled 1/11/74 TED.][1]

Victoria Toll will continue to be handled as per our previous agreement so that the net profit accruing to Davis Constructors will not be included in the amount which you will participate in.

Jobs already completed this year will not be included.

Jobs in progress will be included according to the percentage incomplete.

You will continue to work with Jim in whatever manner we agree upon that will train him to later take over full supervision or qualify him to take a responsible job in the office.

You will provide me with a job status (economic) report as well as a progress schedule on each job each month.

To recap in general, you will build the jobs from start to finish so that I will not necessarily have to worry any about this aspect of the business and leave me free to pursue the acquisition of new business, etc.

This agreement will be subject to review and change at the end of one year or at any time we mutually agree that it is necessary.

Some time after the initial letter agreement was entered into, some areas of disagreement arose between Martin and Davis, and on June 11, 1973, the second letter agreement was entered into. Thereafter, some disagreement still continued, with Martin contending that he was not being properly paid and that he wasn't getting certain information he wanted from Davis, and Davis contending that Martin failed to perform his duties properly, as provided for in the June 11 agreement. On or about May 5, 1975, Davis told Martin he wanted to terminate the agreement and Martin asked for an accounting. No agreement as to the amount allegedly due Martin was reached and thereafter this suit was filed by Martin.

Plaintiff asserts 48 points of error which encompass the following general areas:[2]

1. As a matter of law, no overhead should have been charged on the jobs supervised by Martin in determining the amount due him.

2. In any event, the overhead charges found by the jury were incorrect. [Some 33 points of error complain of particular items of overhead expenses found by the jury.]

3. The trial court erred in submitting 35 items to the jury to determine what items, if any, were to be considered overhead expenses.

4. The two letter agreements must be read and construed together.

5. The interpretation and construction of such letter agreements is a matter for determination by the court and not by the jury.

6. Certain testimony should have been excluded from the evidence.

7. The jury erred in finding plaintiff was not entitled to any additional compensation on the Victoria Toll job.

8. The trial court erred in entering judgment against T. E. Davis alone and in not also entering judgment against Davis Constructors, Inc. and Ed Davis, Inc.

The testimony is detailed and comprehensive. Both parties testified as to the circumstances surrounding the making of such agreement, their intent, the construction

1. The words "on jobs handled" were added by mutual agreement of the parties on January 11, 1974.

2. Most of plaintiff's points of error center around and are connected with plaintiff's first point of error wherein he asserts that the court erred in not withdrawing from the jury any question of overhead and in not finding as a matter of law that no overhead was to be charged against the jobs supervised by Martin.

placed upon the contract by them, and the discussion with regard to overhead. There was also testimony both by the parties and other witnesses as to whether or not the parties agreed that a deduction would be made for overhead in computing the amount Martin was entitled to, how the overhead was computed and allocated to the various jobs, areas of disagreement between the parties, testimony by accountants and contractors as to the meaning of the term "net profits" in the industry, and testimony as to the normal and customary methods of determining profits on particular construction jobs.[3]

3. The relevant testimony may be summarized as follows:

Plaintiff, Sam Martin, testified that the January 1, 1973 letter agreement put into writing the previous oral agreement between Davis and himself; that Davis approached him thereafter about changing this agreement; that Davis told him the new agreement would be essentially the same, but that Martin was to be paid a salary of $20,000.00 a year and 20% of the net profits; that he agreed to such change with the understanding that Davis would, like before, furnish all of the overhead; that subsequently the June 11 letter agreement was entered into; and that by mutual agreement the letter agreement was amended on January 11, 1974 by adding the words "on jobs handled." He stated that under such agreement he did receive his commission on some of the jobs, but that he did not know overhead was being deducted. He testified that on May 5, 1975 Davis told him he wanted to terminate the relationship when the current jobs were finished; that he insisted on an accounting, but that they failed to reach an agreement as to the amount Davis owed him.

Two other witnesses for plaintiff testified with regard to the question of "net profits." Martin's son, an accountant, stated that net profit of a job would not include overhead; that overhead expenses are an expense of the business, not of a job. He conceded that the definition of "net profits" would normally be the total income less the total expenses, including overhead. Another CPA testified that "profit on the job" would be direct material and direct labor and indirect costs, but would not include general administrative expenses.

Davis testified that sometime after the January 1, 1973 letter agreement was made, he wanted to change the agreement because of some dissatisfaction with the work and that the June 11 letter agreement was then entered into; that under the June 11 letter agreement Martin's chief duty was to supervise out of town jobs, with some general supervision over in town jobs.

Davis testified that prior to the making of the June 11 agreement, he and Martin thoroughly discussed the matter of overhead charges; that he knew from previous experience that overhead expenses would be about 5%, which was discussed with Martin; that Martin knew exactly what the agreement was, made no complaint in regard thereto, and knew overhead was to be deducted. He denied he ever told Martin that the 80% net profit which Davis was to receive under the June 11 agreement would cover all the overhead expenses. He further testified that certain costs, such as material, labor, insurance, and bonds are directly charged to individual jobs; that overhead is kept as a separate record and is prorated to the various jobs at the end of the year.

He testified in some detail about the deterioration of the relationship between himself and Martin; that on May 5, 1973 he told Martin that after the Oaks Townhouses project was completed it would be a good time to terminate the agreement; that he agreed to work out the particulars and pay Martin what he had coming; that his CPA worked out the figures and a check was tendered to Martin; and that shortly thereafter he received notice from Martin's attorney that a suit was going to be filed.

Several employees of Davis testified as to general dissatisfaction with Martin's work and some other witnesses, including architects, testified as to dissatisfaction with certain jobs.

Charles Haymore, an attorney and CPA for Davis, testified in detail how Davis' books were kept and as to how the items of overhead which were deducted against Martin's jobs were computed. An exhibit (Defendant's Exhibit Z) was introduced into evidence, which showed the overhead expenses charged on each job, and Haymore testified at length from such exhibit. He was cross-examined at length by Martin's attorney about each individual overhead item shown on such exhibit.

He testified that "net profit" was the gross income minus all other costs and expenses for operating jobs.

Sam Bell, a CPA, gave his definition of gross profits and net profits, which supported Davis' contentions, and stated that Davis' accounting methods were the normal and customary methods of determining profit in construction work, and stated that overhead expenses should be charged against each of the various jobs or projects.

Other testimony by employees of Davis supported Davis' contention that Martin knew overhead was to be deducted. A supervisor for Davis testified that he had a somewhat similar agreement with Davis with regard to compensation in which he was paid a salary and an additional compensation based on a percentage between the difference between job income and job cost after overhead of 5% was deducted, and that he and another employee of Davis,

We will consider all of plaintiff's complaints together.

## I

We first consider plaintiff's contention that: (a) the two letters must be read and construed together; and (b) the interpretation and construction of such letter agreements was for the court and not a jury.

■ In support of his contentions that the two letter agreements must be read and construed together, plaintiff relies on that line of cases holding that where several instruments executed contemporaneously or at different times pertain to the same transaction, they will be read together, even though they do not expressly refer to each other. *Board of Ins. Com'rs v. Great Southern Life Ins. Co.*, 150 Tex. 258, 239 S.W.2d 803 (1951); *McLean v. Hillman*, 352 S.W.2d 310 (Tex.Civ.App.—Amarillo 1961, no writ). We have no disagreement with these cases; however, where the instruments are separate, distinct, and completely different, the first contract is not considered in construing the second.

■ In any event, we reach the same result herein, whether we read the two letters together or consider them separately. It is clear that the second letter materially changed the agreement and the relationship between the parties. The first letter does not provide for any salary. It sets up certain specific duties and obligations of each of the parties and provides that Martin will handle jobs supervised by him just as if he was an independent contractor; it does not refer to or mention "net profits," but provides for a percentage of profits. The second letter provides for an annual salary and changes the relationship from that of an independent contractor type of relationship to that of an employee-employer type of relationship. The second letter provides that the additional compensation be based upon a percentage of net profits which is much less than the percentage of profits called for in the first letter. It also makes a differentiation between jobs already completed, those in progress, and future jobs. Even if we construe the two letter agreements together, it is clear that there has been a modification of the terms of the first contract by the parties.[4]

We have concluded that the computation of net profits as to the jobs involved was correctly based upon the modified terms of the second letter agreement.

Plaintiff next contends that the construction and interpretation of such contracts was for the court and not the jury because there were no pleadings of fraud or ambiguity, and that no question of fact was presented for the jury.

■ It is true that the construction of the legal effect of an instrument is for the court and not the jury, and if the agreement is unambiguous, the meaning thereof is determined as a matter of law by the language used therein. *Trinity Universal Ins. Co. v. Ponsford Brothers*, 423 S.W.2d 571 (Tex.1968); *Tower Contracting Co. v. Flores*, 157 Tex. 297, 302 S.W.2d 396 (1957). However, the jury may resolve an ambiguous intent. *Trinity Universal Ins. Co. v. Ponsford Brothers, supra.* While plaintiff asserts that there are no pleadings of ambiguity, plaintiff did plead in the alternative that the June 11 letter agreement was ambiguous and that it does not state the real intentions of the parties at the time the contract was made. It is evident from the pleadings of both parties, and the evidence, that there is a genuine dispute between the parties as to the meaning and construction of the letter agreements and as to the intent of the parties. Both parties testified in some detail as to the circumstances surrounding the making of the letter agreement, their understanding of the agreement, their intent, and the construction placed by them upon the agreement.

and Martin, had discussions on several occasions pertaining to the overhead charges.

4. As a general rule, a contract that is modified and changed by mutual consent of the parties constitutes a new agreement that takes the place of the original contract. 13 T.J.2d § 272 *Contracts* (1960).

Under the record, a construction and interpretation of the contract became necessary. In order to arrive at a proper construction it was necessary for the court to consider the circumstances surrounding the making of the contract, the intent of the parties, their understanding of the agreement and what was contemplated by the parties and the construction placed upon the contract by the parties thereto.

We have concluded that the trial court did not err in admitting testimony as to these matters. While some of the issues may involve mixed questions of law and fact, we have also concluded that the court did not err in submitting such issues to the jury under the pleadings here involved, the wording of the letter agreements, and the testimony. See *G & W Marine, Inc. v. Morris*, 471 S.W.2d 644 (Tex.Civ.App.—Beaumont 1971, no writ); *City of Houston v. Howe & Wise*, 323 S.W.2d 134 (Tex.Civ. App.—Houston 1959, writ ref'd n. r. e.).[5]

## II

Plaintiff further asserts that: (a) the trial court erred in not holding as a matter of law that no overhead was to be charged against the jobs supervised by Martin; (b) in submitting 35 items to the jury to determine what items, if any, were to be considered as overhead expenses; and (c) in any event, the jury's answers to such items were incorrect and were not supported by the evidence.

In order to determine the percentage of net profits that Martin was entitled to under the letter agreements, a material question presented is whether overhead is to be charged, and if so, what are proper overhead charges.

The term "net profit," standing alone and otherwise unexplained, has plagued the courts for many years and is the subject of varying interpretations and decisions. It has been said that the term to a large degree is self-explanatory and implies, generally speaking, what remains in the conduct of a business after deductions from its total receipts all the expenses incurred in carrying on the business. *Dealers' Granite Corp. v. Faubion*, 18 S.W.2d 737 (Tex.Civ. App.—Austin 1929, no writ). Net profit has also been defined as the gross amount that would have been received pursuant to the business or investment, less the cost of running that business. 22 Am.Jur.2d § 178 *Damages*, at 253 (1965).

The term "profits," as used in an agreement by which profits are included as a basis for compensation, should be construed in accordance with the language of the contract and the surrounding conditions and circumstances, and generally means that which remains of the gross receipts of the business after all legitimate expenses have been deducted. 56 C.J.2d *Master and Servant* § 112, at 548 (1948).

Appellant makes some contention that the addition of the words "on jobs handled" on January 11, 1974 to the letter agreement of June 11, 1974, strengthens his position. It appears clear from the testimony in the record that these words were added to clarify the understanding that 20 percent of the net profits would be paid to Martin only from the jobs he was supervising, and not on jobs not supervised by him. Martin's own testimony is that such words were added after Davis and he agreed that Jim Ford, another supervisor, would handle certain jobs alone, and that Martin would only get paid on the jobs he personally handled. Appellant argues that a proper construction of the entire letter, including the added words, is that net profits on the job means gross profits from such jobs minus only the direct expenses incurred on or at the job site and would not include overhead. While there is some testimony that supports his contention, there is ample testimony to the contrary. There is sufficient

---

5. The Houston court said that the trial court, from the wording of the contract and the surrounding circumstances, determined that the contract was susceptible of more than one meaning and was therefore ambiguous. Extrinsic evidence, thereupon, became properly admissible to remove the ambiguity of the words used in the contract, and it was for the jury to resolve the issue as to the intent of the parties.

evidence in the record that "net profits on jobs handled" means gross income earned less direct costs and allowable overhead expended with respect to jobs supervised by Martin, and that the jury's answers pertaining to overhead are sufficiently supported by the evidence.

We have concluded that overhead expenses were a proper and legitimate expense in determining the amounts payable to Martin, and that the trial court correctly held that overhead expenses were to be included in determining Martin's share of the compensation. The court properly submitted to the jury for its determination what items, if any, were necessary overhead expenses. (Special Issue No. 4) The jury's answers to the various items of overhead expenses are sufficiently supported by the evidence.

### III

Plaintiff complains of the jury's finding that plaintiff was not entitled to any additional compensation in the Victoria Toll job, and asserts that the trial court should have rendered judgment for him as a matter of law in the amount of $2,414.76, or in the alternative, $2,186.21 on the Victoria Toll job, because the undisputed evidence shows that plaintiff was entitled to such sums. We disagree. There is testimony in the record that plaintiff was overpaid on such job, although there is also conflicting testimony. Defendant's CPA testified that expenses were incurred on this job after the job was closed and the income received, involving chiefly a refund that Davis made to the telephone company because the telephone company had accidentally paid for the same invoice twice. Such accountant also testified that the amount paid to Martin was $573.80 more than the amount of profits that he was entitled to.

Under the record: (a) there is sufficient probative evidence to support the jury's finding that plaintiff was not owed any additional money on the Victoria Toll job; (b) the court did not err in refusing to enter judgment for Martin for the additional sum claimed by him.

### IV

Plaintiff also complains that the court erred in allowing certain testimony of T. E. Davis and Charles Haymore pertaining to overhead charges. In reply thereto, defendant asserts that: (a) it was not error to admit such testimony; (b) such testimony was in answer to and in rebuttal to prior testimony of plaintiff; and (c) if there was any error, it was harmless error.

A review of the evidence complained of reveals that plaintiff, on direct testimony, testified in considerable detail as to overhead, testifying among other things, that it was agreed that no overhead was to be charged. Davis thereafter also testified as to overhead, rebutting some of the contentions made by plaintiff, and testifying in some detail as to discussions thereto. Davis denied that he ever stated that no overhead was to be charged and testified that Martin knew overhead was to be charged and made no complaint.

Haymore also testified in detail as to how the books were kept and how overhead was determined and charged, and much of it is in rebuttal of plaintiff's evidence. Defendant's Exhibit Z was introduced into evidence showing the various items of overhead charged and much of Haymore's testimony was in connection with such exhibit. Haymore was cross-examined at length by plaintiff's attorney about each individual item shown in Defendant's Exhibit Z.

We overrule plaintiff's points of error pertaining to the admissibility of the complained of evidence.

### V

We agree with plaintiff's contention that judgment should have been entered against Davis Constructors, Inc. and Ed Davis, Inc., in addition to T. E. Davis individually. There is nothing in the record to explain why these corporate defendants were omitted. Davis asserts in his brief that the original draft of such judgment included the corporate defendants, but that it was changed and revised at the request

of plaintiff's counsel. We have found nothing in the record substantiating this. In their brief, defendants state they have no objection to reforming the judgment to include such corporate defendants.

We have concluded that: (1) the trial court did not err in not holding, as a matter of law, that no overhead was to be charged in determining the amounts to be paid to Martin on the jobs involved; (2) the court's submission of, and the jury's answers to, Special Issue No. 4 (overhead expenses) was sufficiently supported by the evidence, and the wording of the court's charge was not a comment on the weight of the evidence; (3) the trial court was correct in not rendering judgment for plaintiff with respect to the Victoria Toll job, and the jury's findings that plaintiff was not entitled to any additional compensation on such job is sufficiently supported by the evidence; (4) judgment should have been entered against T. E. Davis, Davis Constructors, Inc., and Ed Davis, Inc., rather than against T. E. Davis alone.

The judgment is reformed so as to provide that judgment is entered against T. E. Davis, Davis Constructors, Inc., and Ed Davis, Inc., jointly and severally. As so reformed, the judgment is affirmed.

CADENA, J., not participating.