Calvin HARRIS, Madelyn Harris, and Kalvin Guyton, Appellants,

v.

HOUSTON LIVESTOCK SHOW & RODEO, INC. and Corral Club, Inc., Appellees.

No. 01–09–00590–CV.

Court of Appeals of Texas, Houston (1st Dist.).

March 10, 2011.

Rehearing Overruled Dec. 5, 2011.

George M. Fleming, Rand Patrick Nolen, Fleming & Associates, L.L.P., Jodey D. Hinze, Keith M. Fletcher, Simmons & Fletcher, P.C., Houston, TX, for Appellants.

Bruce C. Gaible, Ruth E. Piller, Hays, McConn, Rice & Pickering, P.C., Houston, TX, for Appellees.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

ELSA ALCALA, Justice.

The case underlying this appeal concerns an off-duty police officer who drank free beer at a private, after-hours party and then caused serious injuries to two people when he rear-ended a stalled SUV. The injured parties, appellants, Calvin and Madelyn Harris and Kalvin Guyton, brought suit under the Dram Shop Act[1] against Corral Club, Inc. ("Corral Club") and Houston Livestock Show & Rodeo, Inc. ("HLS & R"). The Harrises and Guyton separately appeal summary judgment granted in favor Corral Club and HLS & R. In their first two issues, appellants each contend that summary judgment is improper because Corral Club was the "provider," as defined by the Dram Shop Act, of the beer and that HLS & R is vicariously liable based on a joint enterprise theory.[2] We conclude that the Corral Club failed to show conclusively that it, acting through its agents, was not the "provider" of the beer. We reverse that portion of the summary judgment and remand for further proceedings. We also determine that HLS & R conclusively es-

1. Chapter 2 of the Texas Alcoholics Beverage Code, TEX. ALCO. BEV.CODE ANN. §§ 2.01–.03 (West 2007), is commonly known as the Dram Shop Act. *20801, Inc. v. Parker,* 249 S.W.3d 392, 395 n. 2 (Tex.2008).

2. In their third and fourth issues, the Harrises separately contend that exemplary damages are recoverable under the Dram Shop Act and that the trial court erred by denying their motion for reconsideration. Because exemplary damages have been neither awarded nor denied, we do not reach the question of whether they are recoverable under the Act. *See Pub. Util. Comm'n v. Houston Lighting & Power Co.,* 748 S.W.2d 439, 442 (Tex.1987) ("A court has no jurisdiction to render an advisory opinion on a controversy that is not yet ripe."); *Texas Natural Res. Conservation Comm'n v. McDill,* 914 S.W.2d 718, 725 (Tex. App.-Austin 1996, no writ) (declining to reach question of availability of exemplary damage when cause was remanded for new trial).

tablished that there was no joint enterprise between it and Corral Club. We affirm the summary judgment rendered in favor of HLS & R.

## Background

Each year, HLS & R operates an entertainment and livestock exhibition (the "Rodeo") at Reliant Stadium. In the 1980s, HLS & R entered into a written agreement with Corral Club, a separate legal entity. In the agreement, HLS & R agreed to allow Corral Club to sell and dispense alcoholic beverages during the Rodeo. In exchange, Corral Club agreed to pay HLS & R a percentage of the total revenue. In addition, Corral Club agreed to "pay for the cost of all liquor obtained for sale" and to reimburse HLS & R for any expenses it incurred for Corral Club's benefit. The agreement "contemplate[s] that [HLS & R] may use the Areas [where alcoholic beverages are sold or dispensed] in support of its fund-raising activities . . . provided, however . . . [HLS & R] shall not sell or dispense alcoholic beverages." The agreement further states that "Corral Club is encouraged to utilize staff of [HLS & R] provided, however, it is understood that any staff member . . . or any other person used to operate the Areas for the sale or dispensing of alcoholic beverages shall be under the exclusive control, supervision and care of Corral Club."

HLS & R organizes its thousands of volunteers into various committees, which assist the Rodeo in different ways. In 2006, the volunteers assigned to the Corral Club Committee (the "Club Committee") were responsible for the day-to-day operations of the Club East Bar, located on the third floor of Reliant Stadium. All alcoholic beverages, including mixed beverages, wine, and beer, at the Club East Bar were purchased by Corral Club. Unlike Corral Club, HLS & R was not authorized, under a Texas Alcoholic Beverages Commission (TABC) license or permit, to sell alcoholic beverages. When the Rodeo was open to the public, only bartenders paid by Corral Club sold and served alcohol at the Club East Bar. Volunteers with the Club Committee, however, assisted by carrying out functions other than dispensing alcohol. Club Committee volunteers monitored the entrances and exits to bar areas, ensuring that alcoholic beverages did not come in or out. Other Club Committee volunteers stocked the bars with alcoholic beverages and other supplies as needed. At the close of business each night, Club Committee volunteers were responsible for balancing out, that is, determining and recording the quantity of alcohol dispensed.

The Club Committee was divided into three teams, each composed of about 60 volunteers. One of the teams was managed by assistant club chairman W. Wayne Haston. In turn, Haston reported to the general chairman of the Club Committee. While Haston and the general chairman were volunteers, they ultimately reported to Mike Demarco. Demarco simultaneously served as HLS & R's executive director of operations and Corral Club's president.

A small, private party for Haston's team of Club Committee volunteers and their guests was scheduled to be held at the Club East Bar after the close of business on the second-to-last day of the Rodeo. At 7:30 p.m., the Rodeo ended, and the public was cleared out of Reliant Stadium. At the same time, the Club East Bar was also closed to the public, and Club Committee volunteers balanced out the bar.

Earlier that day, Ramiro Olivares, an off-duty police officer employed by HLS & R to work security, was invited to attend the Club Committee party. At 9:30 p.m., Olivares arrived at the party sober. Although he was not a member of the Committee, he was acquainted with several

members. Haston and other Club Committee volunteers were serving free mixed beverages, wine, and beer from behind the bar. Although no bartender paid by Corral Club served alcoholic beverages during the meeting, all alcoholic beverages were from stock paid for by Corral Club, which would have been sold to customers attending the Rodeo if it had not been dispensed at the private party. Olivares sat at the bar, socializing for about two hours. During that time, Olivares was served five or six free cans of beer, which he drank. After the party, Club Committee volunteers again balanced out the bar, thus recording the specific quantity of alcohol dispensed during the party. After leaving the party, Olivares collected his belongings, got in his truck, and drove directly to a dance club. After four more cans of beer, he left around 2:00 a.m. and headed home.

It was raining lightly as Olivares drove northbound on East 610 Loop, traveling at about 55 mph. As he began to dial a friend's phone number on his cell phone, Olivares was coming over the crest of an overpass when he noticed a stalled SUV in front of him. Olivares pressed the brake, but his truck collided with the SUV. At the moment of impact, Kalvin Guyton, the owner of the SUV, and Calvin Harris, who had stopped to assist, were leaning against the front of the SUV, looking under the hood. The momentum of Olivares's truck pushed the SUV forward, which then knocked Guyton and Harris over the railing, after which they fell approximately 30 feet to the ground below. The SUV continued forward and collided with Harris's parked car. The resulting explosion and fire wholly consumed all three vehicles. Although they lived, Guyton and Harris suffered serious injuries. Calvin's wife, Madelyn, saw the truck push the parked

vehicles, the ensuring fire, and her husband lying on the ground below. Olivares was arrested, and approximately three hours after the accident, his blood alcohol level was .22—almost three times the level establishing intoxication per se.

The Harrises sued Corral Club and HLS & R under the Dram Shop Act. The Harrises contended that Corral Club was directly liable pursuant to the Dram Shop Act and that HLS & R was vicariously liable based on the assertion that the Club East Bar was operated as a joint enterprise. Guyton intervened in the suit, asserting the same claims.

Corral Club and HLS & R filed a motion for traditional summary judgment on grounds that (1) Corral Club was not a "provider," as defined by the Dram Shop Act, of the beer because none of its employees sold or served the beer to Olivares and (2) HLS & R was not vicariously liable based on a joint enterprise theory because it did not share a community of pecuniary interest with Corral Club. The trial court granted Corral Club and HLS & R's motion for summary judgment. The trial court severed Corral Club and HLS & R from the lawsuit, making this judgment final and appealable.[3]

## Dram Shop Liability

The Harrises and Guyton assert the trial court erred by rendering summary judgment in favor of Corral Club and HLS & R.

### A. Standard of Review

An appellate court reviews de novo a trial court's ruling on a summary judgment motion. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex.2009). To succeed on a summary judgment motion under Texas

3. The Harrises' and Guyton's claims against    other parties are not before us on appeal.

Rule of Civil Procedure 166a(c), a movant must establish that there is no genuine issue of material fact so that the movant is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex.1995). To conclusively establish a matter, the movant must show that reasonable minds could not differ as to the conclusion to be drawn from the evidence. *Henry v. Masson*, 333 S.W.3d 825, 843 (Tex.App.-Houston [1st Dist.] 2010, no pet.) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 814 (Tex.2005)). The evidence is reviewed in the light most favorable to the non-movant, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not. *Mann Frankfort Stein*, 289 S.W.3d at 848 (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). An appellate court may not affirm the summary judgment on a ground not presented specifically in the motion for summary judgment. *Travis v. City of Mesquite*, 830 S.W.2d 94, 100 (Tex.1992); *see State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex.2010).

### B. Applicable Law

In pertinent part, section 2.02(b) of the Texas Alcoholic Beverage Code states:

Providing, selling, or serving an alcoholic beverage may be made the basis of a statutory cause of action under this chapter . . . upon proof that:

(1) at the time the provision occurred[,] it was apparent to the provider that the individual . . . was obviously intoxicated to the extent that he presented a clear danger to himself and others; and

(2) the intoxication of the recipient of the alcoholic beverage was a proximate cause of the damages suffered.

TEX. ALCO. BEV.CODE ANN. § 2.02(b) (West 2007). Only a "provider," as defined by the Dram Shop Act, is liable under section 2.02(b). *Smith v. Merritt*, 940 S.W.2d 602, 605 (Tex.1997) (noting that section 2.02(b) "creates a statutory cause of action against *commercial* providers only") (emphasis in original); *Graff v. Beard*, 858 S.W.2d 918, 919 (Tex.1993) (holding Dram Shop Act applies only to commercial providers). The Dram Shop Act broadly defines "provision" by stating that it "includes, but is not limited to, the sale or service of an alcoholic beverage." TEX. ALCO. BEV.CODE ANN. § 2.01(2) (West 2007). In contrast, the Act defines "provider" as

a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of this code or who otherwise sells an alcoholic beverage to an individual.

*Id.* § 2.01(1) (West 2007). The Texas Alcoholic Beverage Code defines a "person" as "a natural person or association of natural persons, trustee, receiver, partnership, corporation, organization, or the manager, agent, servant, or employee of any of them." *Id.* § 1.04(6) (West Supp. 2010). Likewise, a "permittee" is defined as "a person who is the holder of a permit provided for in this code, or an agent, servant, or employee of that person[,]" and a "licensee" is defined as "a person who is the holder of a license provided in this code, or any agent, servant, or employee of that person." *Id.* § 1.04(11), (16).

### C. Analysis

Because it is undisputed that the beer served to Olivares was free, Corral Club can be a "provider" only if it "serves an alcoholic beverage under authority of a license or permit issued under the terms of" the Texas Alcoholic Beverage Code. *See id.* § 2.01(1). Additionally, because in its motion for summary judgment, Corral Club admits that it "was licensed as a

commercial provider of alcohol … on the night in question[,]" the disposition of this case depends solely on the evidence concerning (1) whether Corral Club served the beer to Olivares and (2) if so, whether HLS & R is vicariously liable. *See id.*

### 1. Corral Club

■ In its entirety, Corral Club's motion for summary judgment concerning whether it was the "provider" of the beer served to Olivares states:

> While Corral Club, Inc. was licensed as a commercial provider of alcohol, no employee of Corral Club, Inc. sold or served alcohol to Ramiro Olivares on the night in question. The timesheets show that the servers and bartenders working for Corral Club, Inc. were off work by no later than 8 o'clock p.m. The committee party where Olivares was allegedly served did not begin until around 8:30 p.m. Olivares testified he did not start drinking at Reliant that evening until about 9:30 p.m. or 9:45 p.m. Further, volunteer members of the Corral Club Committee of the HLS & R were serving alcohol at the time Olivares was drinking at Reliant and not paid employees of Corral Club, Inc. The summary judgment establishes no employee of Corral Club, Inc. served Olivares alcohol on the night in question. Therefore, Corral Club, Inc. is not a "provider" for purposes of the Dram Shop Act and cannot be held liable for [the Harrises'] and [Guyton's] injuries under the Act.

(internal citations omitted). The motion asserts Corral Club is not liable as a "provider" under the Dram Shop Act only on the theory that the volunteers were not employees of Corral Club. Although the employees of a corporation are one way for a corporation to be liable under the Dram Shop Act, a corporation may be held liable also for the acts of its agents. *See* Tex. Alco. Bev.Code Ann. §§ 1.04(6), (11), (16), 2.01(1); *20801, Inc. v. Parker,* 249 S.W.3d 392, 397 n. 6 (Tex.2008) (Dram Shop "Act authorizes vicarious liability [that] … is in some ways similar to liability arising from the common law doctrine of respondeat superior, under which an employer [or principal] is vicariously liable for the negligence of an agent or employee acting within the scope of his or her agency or employment, although the principal or employer has not personally committed a wrong." (internal quotation omitted)).[4]

Corral Club's motion for summary judgment fails to assert a challenge based on the ground that the volunteers were not acting as its agents. We do not decide the merits of this argument because we may affirm on a ground only if it is presented specifically in the motion for summary judgment. *See State Farm Lloyds,* 315 S.W.3d at 532; *Travis,* 830 S.W.2d at 100. Here, Corral Club's motion is confined to the theory that the volunteers were not employees; it asserts no challenge to the theory that the volunteers were agents of Corral Club.

We note that at oral argument, Corral Club suggested that its motion for sum-

---

4. *See also Schmidt v. Centex Beverage, Inc.,* 825 S.W.2d 791, 794–94 (Tex.App.-Austin 1992, no writ) (corporate wholesale beer distributor that sold beer to non-profit annual music festival, which then served free beer to its volunteers, was not "provider" as defined by Dram Shop Act where its agents did not serve alcohol despite fact that they attended festival); *Sewell v. Smith,* 819 S.W.2d 565, 566, 568 n. 5, 569 (Tex.App.-Dallas 1991), *aff'd,* 858 S.W.2d 350 (Tex.1993) (owner and manager of property on which was located bar that sold beer to its patron was not "provider" as defined by Dram Shop Act where it had no duty to control bar owner's actions and had not retained bar owner to operate the bar on its behalf).

mary judgment addresses only the employee theory because that was the only theory pleaded by the Harrises and Guyton. While neither the Harrises nor Guyton pleaded specifically that Corral Club was a provider based on an agency theory, they both pleaded that Corral Club was a licensed provider of alcohol beverages and that it provided alcoholic beverages to Olivares on the night in question.[5] Because corporations can act only through their agents or employees, the Harrises' and Guyton's pleadings provide fair notice of the agency theory. *See Low v. Henry,* 221 S.W.3d 609, 612 (Tex.2007) (pleading is sufficient if it provides "fair notice," in that opposing party can ascertain nature, basic issues, and type of evidence that might be relevant to controversy); *GTE Sw., Inc. v. Bruce,* 998 S.W.2d 605, 618 (Tex.1999). Additionally, in his response to Corral Club's motion for summary judgment, Guyton contends that Corral Club can be liable as a "provider" if its agent or employee served the beer.[6] Guyton explains that the volunteers were agents of Corral Club based on Corral Club's statutory duty and right to control the service of its alcohol, its distinct interest in how that service was performed, and the benefit it received by utilizing free staff. Guyton also explains that under the borrowed-servant doctrine, "[w]hen the volunteers were volunteering that night, they were volunteering for Corral Club, Inc." Guyton's response points to some evidence that the volunteers may have been acting on behalf of Corral Club. Although they were its paid employees, Corral Club failed to negate the allegation that the volunteers acted as its agents. Accordingly, we hold that the trial court erred by granting summary judgment for Corral Club because, by not challenging the agency theory, Corral Club failed to show conclusively that it was not a "provider." *See* Tex.R. Civ. P. 166a(c); *State Farm Lloyds,* 315 S.W.3d at 532; *Randall's Food Mkts.,* 891 S.W.2d at 644; *Travis,* 830 S.W.2d at 100.

We sustain the first issue.

## 2.  HLS & R

The elements of a joint enterprise are (1) an agreement (express or implied) among the members of the group, (2) a common purpose to be carried out by the group, (3) a community of pecuniary interest among the members in that common purpose, and (4) an equal right to direct and control the enterprise. *St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 525, 530 (Tex.2003). An appellate court first looks to the evidence of an agreement or

---

5.  Specifically, the Harrises pleaded in their third amended petition:

> CORRAL CLUB, INC., is a licensed provider of alcoholic beverages, and ... [it] provided alcoholic beverages to RAMIRO OLIVARES, during the period of time that he was at Reliant Stadium following the [Rodeo].... During the meeting he was provided alcohol by [HLS & R's] committee *personnel* and by CORRAL CLUB, INC.'S personnel and became intoxicated.... When CORRAL CLUB'S *personnel* provided the alcoholic beverages to RAMIRO OLIVARES it was apparent to CORRAL CLUB, INC.'S *personnel* that RAMIRO OLIVARES was obviously intoxicated and presented a clear danger to himself and to others.

(emphasis added.) Guyton pleaded in his second amended petition:

> CORRAL CLUB, Inc .... [is a] licensed provider[ ] of alcoholic beverages, and ... [it] gave alcoholic beverages to RAMIRO OLIVARES.... When ... CORRAL CLUB ... employees provided the alcoholic beverages to RAMIRO OLIVARES it was apparent to ... CORRAL CLUB ... employees that RAMIRO OLIVARES was obviously intoxicated and presented a clear danger to himself and to others.

6.  When asked at oral argument, the Harrises and Guyton confirmed that they adopt each other's arguments in the alternative.

agreements among the members of the group to ascertain their possible common purposes, and then it considers if the evidence supports a finding of a joint enterprise with respect to each possible common purpose. *Id.* at 531. "An enterprise or project is most commonly defined by the common purpose of goal of its members." *Id.*

■ It its motion for summary judgment, HLS & R challenges only element three, a community of pecuniary interest among the members in the common purposes. This element requires proof of a monetary interest that is "shared without special or distinguishing characteristics." *Id.* An indirect, potential financial interest, such as the interest of a franchisor concerning the success of its franchisee, is insufficient to constitute a community of pecuniary interest in the common purpose. *Id.* at 532. The Texas Supreme Court has explained the difference between the interests of a franchisee and its franchisor as follows: "[A] franchisee benefits from receiving the income and any resulting profits generated by its sales and by the market value of his or her franchise resulting from its profitability. The franchisor benefits by receiving royalty payments from its franchisee based on those sales and by the enhanced value accruing to its franchise opportunities resulting from the financial success of the existing franchises." *Id.* at 527. Although a franchisee stands to benefit financially from the successful downstream marketing of its goods and services, this alone fails to establish a community of pecuniary interest between it and its franchisor. *Id.* at 528. The interests of a franchisee and its franchisor "are not held in 'community' ... because [their interests] are not shared 'without special or distinguishing characteristics.'" *Id.*

Like the franchisor—franchisee situation discussed in *St. Joseph Hospital,* HLS

& R benefited by receiving from Corral Club a portion of the revenues from the drinks sold at the Club Bar East, and Corral Club benefited by retaining all remaining revenue not paid to HLS & R. While HLS & R stands to benefit from Corral Club's success, its interest in the running of Club Bar East—a percentage of total revenue regardless of costs—differs from Corral Club's interest—profits minus the fee paid to HLS & R. As it points·out in its motion, HLS & R did not reimburse Corral Club for the cost of the drinks served. We conclude that the trial court properly granted summary judgment for HLS & R because it showed conclusively that it was not engaged in a joint enterprise with Corral Club. *See* TEX. R CIV. P. 166a(c); *Randall's Food Mkts.,* 891 S.W.2d at 644; *St. Joseph Hosp.,* 94 S.W.3d at 525, 531.

We overrule the second issue.

### Conclusion

We affirm the judgment of the trial court as to HLS & R and reverse the judgment as to Corral Club. We remand the cause for further proceedings.