

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-15-00133-CV
_____

IRIS MENDOZA, AS REPRESENTATIVE OF THE ESTATE OF HUY PHAM,
DECEASED, AND AS NEXT FRIEND OF J. V. P., A MINOR AND HOUNG PHAM AND
VINH PHAM, APPELLANTS

V.

LOUISIANA STONE, LLC AND WAYNE HOPPER, APPELLEES

_____

On Appeal from the 251st District Court
Potter County, Texas
Trial Court No. 103,962-C, Honorable Ana Estevez, Presiding

_____

December 22, 2015

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

This is an appeal from a summary judgment denying Iris Mendoza (as representative of the estate of Huy Pham and next friend of J.V.P., a minor), Houng Pham, and Vinh Pham (collectively referred to as Mendoza) recovery against Louisiana Stone, LLC and its employee Wayne Hopper.[1] The lawsuit arose from the death of Huy Pham, an employee of Panhandle Quartz Fabricators (Panhandle). He died while employees of Panhandle prepared slabs of granite located in Panhandle's sales lot for

_____

[1] Others were also sued by Mendoza. However, the claims asserted against Stone LLC and Hopper were severed from the cause once they were granted summary judgment.

removal from the premises. The slabs in question were owned by Stone, originally delivered to Panhandle on consignment for sale, and being returned to Stone. The latter's vehicle, which was driven by Hopper at the time, awaited the delivery outside the sales lot when a granite slab fell on Pham inside the lot.

According to Mendoza, the negligence of Stone and Hopper purportedly caused Pham's death. Alternatively, Mendoza asserted that Stone and Hopper were in a joint enterprise or venture with Pham's employer and, consequently, vicariously liable for his death. Stone LLC and Hopper filed both a traditional and no evidence motion summary judgment. The trial court granted same. Before us, Mendoza argues that evidence of record created a material issue of fact on each element of her causes of action. So too does she assert that there was sufficient evidence of record to pretermit summary judgment on her claims of joint venture and enterprise. We affirm.

*Standard of Review*

As recently noted by our Supreme Court in *Cantey Hanger, L.L.P. v. Byrd*, 467 S.W.3d 477 (Tex. 2015), we review a grant of summary judgment *de novo. Id.* at 481. When conducting that review, we accept as true all evidence favorable to the nonmovant and indulge in every reasonable inference arising from and resolve all doubts related to that evidence in favor of the nonmovant. *Id.* Additionally, when the trial court does not specify the basis for its summary judgment, as here, the nonmovant must show on appeal why none of the proffered grounds have merit. *Burnett Ranches, Ltd. v. Cano Petroleum, Inc.*, 289 S.W.3d 862, 870 (Tex. App.—Amarillo 2009, pet. denied).

Finally, when the motion for summary judgment contains both traditional and no-evidence grounds, then we first address the no-evidence grounds. *Merriman v. XTO*

2

*Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).  This is so because the non-movant has the burden to present evidence establishing a material issue of fact concerning the element under attack.  *Id.*  If he fails to produce legally sufficient evidence to meet his burden, there is no need to analyze whether the movant satisfied its burden under the traditional motion.  *Id.*  And, the no-evidence challenge will be sustained when 1) there is a complete absence of evidence of a vital fact, 2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, 3) the evidence offered to prove a vital fact is no more than a mere scintilla, or 4) the evidence conclusively establishes the opposite of the vital fact.  *Id.*[2]

*Negligence*

We first address the claim of negligence.  Stone and Hopper asserted, in their motion for summary judgment, that they were entitled to a traditional summary judgment because neither of them "owed to Pham a special duty of care, they did not breach that duty, and no act or omission on the part of either [of them] . . .  proximately caused the damages . . ."  Mendoza sought.  They also alleged that they were entitled to a "no-evidence summary judgment on [the] . . . negligence causes of action . . . because [Mendoza] . . . brought forth no evidence on any of the required elements of those theories of recovery or liability."  According to Mendoza, the record contained evidence sufficient to create a material issue of fact on each element of the negligence claim.  We overrule the issue.

---

[2] Throughout Mendoza's brief, she posits that her opponents failed to negate elements of the claims as a matter of law.  Because her opponents' motion for summary judgment contained both traditional and no-evidence grounds challenging the same elements of her claims, she had the burden to create the requisite material issues of fact.  So, her proposition about Stone and Hopper having failed to negate the elements in play is somewhat inaccurate; again, it fell upon her to prove they were not entitled to summary judgment by presenting more than a scintilla of evidence illustrating the existence of those elements.

The elements of negligence are a legal duty, its breach, and damages or injury proximately caused by that breach. *Rodriguez-Escobar v. Goss*, 392 S.W.3d 109, 113 (Tex. 2013). Whether a duty exists is a question of law. *Boerjan v. Rodriguez,* 436 S.W.3d 307 (Tex. 2014); *Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d 401, 404 (Tex. 2009). We address the issue of duty at this point.

Here, the injury occurred on the premises of Panhandle. That is, Panhandle employees were utilizing equipment other than that of Stone or Hopper to remove slabs of granite from the A-frame upon which they rested within Panhandle's sales lot. Pham was one of the Panhandle employees involved in the effort. The slabs were strapped together resting on the structure. Normally, three individuals are involved in the process. One would hold the slabs together. One would unstrap the slabs, and one would use a forklift to take the slabs to their destination. On the day of the accident, Pham loosened the strap holding the slabs together without the other employee being present to hold them together. One or more slabs then fell on him.

We were cited to no evidence of record indicating (nor did we find evidence of record from which it could be reasonably inferred that) the procedures being utilized by Panhandle's employees to accomplish their assigned task were adopted, developed, implemented or supervised by Stone and Hopper.[3] According to Panhandle's forklift operator, neither Stone nor Hopper told them "how to pick up stone off an A-frame. . . ." Instead, the employees acted pursuant to their own experience or the direction of their

---

[3] We often state throughout this opinion that we were cited to no evidence on a particular matter. We do this because the appellant (Mendoza) had the burden to direct our attention to those portions of the record purportedly entitling her to reversal. *Manautou v. Ebby Halliday Real Estate, Inc.*, No. 05-13-01035-CV, 2015 Tex. App. LEXIS 1942 at *9 (Tex. App.—Dallas February 27, 2015, pet. denied) (mem. op.) (stating that when a trial court grants a no-evidence motion for summary judgment, "in order to adequately challenge on appeal each possible ground for summary judgment, an appellant must cite the specific evidence in the record that it relied upon to defeat the motion and describe why that evidence raised a fact issue"). We have no independent obligation to peruse the record for evidence supporting her contention.

employer, Panhandle. Nor were we cited to evidence of record from which it could be inferred that either Stone or Hopper selected the particular Panhandle employees to perform the task. And, while the intent of those involved may have been to ultimately load the slabs onto Stone's truck, the granite was not being loaded onto the vehicle when it fell atop Pham. We make these preliminary observations because of the nature of the duty Mendoza seeks to impose on Stone and Hopper.

She would have the court burden Stone, her opponents, with a duty of care regarding the way in which third-parties (*i.e.* Panhandle and its employees) performed their jobs. Such a proposition calls into play the well-settled rule that "in the absence of a relationship between the parties giving rise to the right of control, one person is under no legal duty to control the conduct of another, even if there exists the practical ability to do so." *Loram Maintenance of Way, Inc. v. Ianni*, 210 S.W.3d 593, 596 (Tex. 2006). Normally, the relationships which may impose such a duty are employer and employee, parent and child, or, at times, independent contractor and contractee. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). That none of those exist here is undisputed. Yet, the duty should be imposed, according to Mendoza, because the danger of injury was foreseeable, and Stone and Hopper allegedly had some right of control. *See Nabors Drilling, Inc. v. Escoto*, 288 S.W.3d at, 404-405 (stating that "[l]iability is grounded in the public policy behind the law of negligence which dictates every person is responsible for injuries which are the reasonably foreseeable consequence of his act or omission" and that the "factors which should be considered in determining whether the law should impose a duty are the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the

5

magnitude of the burden of guarding against the injury[,] and consequences of placing that burden on the employer.").

Regarding the foreseeability of danger, we take cue from *Nabors*. As mentioned above, liability stems from the belief that people should be responsible for injury reasonably foreseeable from *their* act or omission. *Id.* Evidence appears of record indicating that moving slabs of granite was dangerous. Yet, the act or omission undertaken by Stone and Hopper and from which the injury arose concerned their allowing Panhandle and its employees to perform the process. Simply put, they did nothing but await delivery of the product outside Panhandle's lot. So, the inquiry is whether it was reasonably foreseeable that their decision to simply await delivery of the granite to the truck presented a foreseeable risk of injury.

Aside from this accident, we were cited to no evidence of other incidents involving granite falling on someone when it was being loaded or unloaded in the manner selected by Panhandle. Nor were we cited to evidence indicating that 1) Panhandle and its employees were incapable of performing that process with care or 2) that either Stone or Hopper knew or should have known that Panhandle and its employees were incapable of performing the process safely. So, there is no evidence supporting the notion that the decision of Stone and Hopper to allow Panhandle employees to load and unload the granite presented a reasonably foreseeable risk of injury.

Regarding the right to control the actions of Panhandle, it is true that such a right may give rise to a duty of care. *Id.* at 526 (stating that ". . . to predicate liability on a contractor/subcontractor relationship, it must be shown that the contractor controlled the work of the subcontractor"); *accord, Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778,

783 (Tex. 2001) (stating that "[o]ne who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."). Yet, to the extent that the right creates a duty, the duty "is commensurate with the control" retained. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d at 783. For instance, if the right to control encompasses activity A but not activity B, then there is no duty related to activity B.

Additionally, while the requisite right may arise either contractually or through the actual exertion of control, *Shell Oil Co. v. Khan*, 138 S.W.3d 288, 292 (Tex. 2004), it must consist of more than a "'general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. . . .'" *Gonzalez v. Ramirez*, 463 S.W.3d 499, 506 (Tex. 2015) *quoting, Koch Ref. Co. v. Chapa*, 11 S.W.3d 153 (Tex. 1999). Other indicia are needed, and they consist of the authority or ability to control the method and operative details of that work. As reiterated in *Gonzalez*, "'[t]here must be such a retention of a right of supervision that the [party allegedly subject to control] is not entirely free to do the work in his own way.'" *Id.* Finally, the right to control must encompass the particular activity "that causes the damage." *Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788, 791 (Tex. 2006) (stating that an employer can be liable for the actions of an independent contractor if the employer "retains some control over the manner in which the contractor performs the work that causes the damage").

Again, Pham was injured while he and his co-employees began the process of removing granite from Panhandle's lot for loading onto the truck of Stone. So, "the work

that cause[d] the damage" encompassed the steps utilized by Panhandle and its employees to complete that process.[4]   And, the evidence of a right to control relied upon by Mendoza at bar consisted of various excerpts from the deposition of Hopper and a Stone salesman.

Regarding the excerpts of Hopper, he stated 1) "yeah, I tell them to stop," when asked if he believed that "the clamp is not correctly secured to the piece of granite, you tell them, right?"; 2) "Not necessarily. They - I could say stop, and they could still pick it up," when asked, "[b]ecause you have the authority to stop that piece of granite from being unloaded *off the back of the trailer*, isn't that correct?"; 3) "right," when asked "but that piece of granite is - you're supposed to be taking care of it at least while it's *on the back of that trailer*, right?"; 4) "yeah," when asked "[a]nd so you could say, no, stop, right?"; and 5) "[w]ell, I got the authority to say it," when asked "[y]ou got the authority to do that, don't you?"  (Emphasis added).  Hopper also acknowledged that unsafe loading practices could put him and the Panhandle Quartz employees at risk.  Of immediate note though is that the excerpts address effort to "unload" granite from the truck of Stone; yet, Pham and his co-workers were not doing that when the accident happened.

---

[4] Incidentally, Mendoza refers to an OSHA report apparently finding fault with the manner in which Panhandle stored the granite.  We were not cited to the location of that report in the multi-page record before us.  Nor did our perusal of the record uncover it.  Instead, the evidence about it consisted of a Panhandle representative stating that OSHA cited the company for the "unsafe holding of material" and "[t]he degree of the land that we . . . placed the A-frame on, the amount of slope."  Also mentioned by Mendoza is the deposition testimony of a Stone employee acknowledging it was dangerous to store granite on an incline.  Such bits of information, according to Mendoza, constitute "some evidence . . . (at least to raise a fact issue) that the location of the slabs on an incline contributed to Huy Pham's death."  If the latter conclusion could logically be inferred from the evidence mentioned, then the "work that causes the damage" also may encompass the selection of the site at which the product was stored.  Yet, we are cited to no evidence indicating that had the granite been placed at a location without a slope then Pham would not have been injured by a falling slab when he prematurely disengaged the strap.  Mendoza says nothing of someone so testifying via affidavit, deposition or otherwise, and whether the OSHA investigators so concluded in their report is unknown.  Nor does Mendoza cite us to evidence revealing the angle of the slope, whether it was forward, backward or sideways, or whether it was enough to cause the slab to fall on its own.  It would seem rather important to have such evidence before one could logically infer that but for some unknown degree of slope in the land Pham would not have suffered injury.  And, without such evidence, we cannot say that the "work that cause[d] the damage" encompassed the selection of a site on the lot at which the granite would be stored.

Moreover, Hopper's concession that he could tell others to "stop" as they unloaded product from the truck comes with the caveat that "they could still pick it up" despite his directive. That signifies an ability to make suggestions that need not be followed, not an obligation to obey. Again, according to *Gonzalez*, more is needed than the ability or right "to make suggestions or recommendations which need not necessarily be followed." *Gonzalez v. Ramirez*, 463 S.W.3d at 506.

So too must there be more than the right "'to order the work stopped or resumed [or] to inspect its progress.'" *Id*. Yet, that is all the Hopper deposition excerpts revealed. He may have been able to tell Panhandle's employee when to start and stop when it came to *unloading* product from the truck. It does not indicate that he had any right to direct them on how to acquire granite from Panhandle's lot. So, in effect, the deposition excerpts of Hopper to which Mendoza cited are not of the caliber from which one can infer that Hopper had the right to control the details of the work causing Pham's injury.

As for the testimony of the salesman, it consisted of 1) his desire to have the products he supplied placed "up front where it's visible and seen when the customer . . . walks in the door" and 2) when asked if he had "ever gone to one of these clients and said, hey, look, give me a break here, we need some of this stuff moved up so people can see it," he replied "[t]hat's exactly right. I'll make a noise." Mendoza also states that the salesman "had the ability to discuss unsafe practices with Panhandle . . . ." The record reference accompanying the latter comment involved the manner in which the granite was "stacked," and the salesman stated that if he encountered something that was a "bad deal" or "out of whack" and "blatant enough," he "would have said something."

9

Assuming *arguendo* that the geographic location of the product was relevant to whether Stone or Hopper had the right to control how granite was removed from Panhandle's lot, (see footnote two), the salesman's deposition excerpts are again deficient for several reasons. First, common sense compels that one having the right to designate a product's location need not have to "make noise" to have it placed in a particular locale. Second, the question being asked when the salesman said that he would "make noise" referenced "clients" in general, not Panhandle. Unknown is whether he ever made "noise" at Panhandle, whether Panhandle ever acceded to the "noise," and whether Panhandle was obligated to accede to that "noise." Because other clients may have to accede to the "noise" does not mean that Panhandle did or would. Third, anyone can discuss security, including a transient who happens to stroll on to the lot. Yet, the ability to discuss is no evidence of an obligation to abide. And, it is the latter that *Gonzalez* deems pertinent.

As previously mentioned, whether a duty existed is a question of law. We answer that question adversely to Mendoza. The circumstances encountered at bar prevent us from concluding that the threshold of *Nabors, Lee Lewis, Gonzalez* or *Fifth Club* was met. So, we cannot impose upon either Stone or Hopper the duty of care sought by Mendoza.

*Joint Venture and Enterprise*

Mendoza also attempts to hold Stone and Hopper vicariously responsible through the theories of joint enterprise and joint venture. Those allegations were also encompassed within the motion for summary judgment. We address each in turn.

*a. Venture*

10

Regarding the matter of joint venture, the summary judgment movants averred that "traditional and no evidence summary judgments are necessary on Claimants' joint venture theory because the summary judgment evidence conclusively establishes and/ or there is no evidence to support that [Panhandle] and [Stone] shared profits or losses or that they had an equal right of control." Mendoza argues on appeal that the evidence created a fact issue on each element of a joint venture. We disagree.

A joint venture is similar to a partnership but is limited to a particular transaction or enterprise. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 319 (Tex. App.— Houston [1st Dist.] 2011, no pet.). It exists when 1) there is a community of interest in a venture, 2) an agreement to share profits, 3) an agreement to share losses, and 4) a mutual right of control or management. *St. Joseph Hosp. v. Wolff*, 94 S.W.3d 513, 535 (Tex. 2002). Without a specific agreement to share losses, no joint venture can be implied. *Coastal Plains Dev. Corp. v. Micrea, Inc.*, 572 S.W.2d 285, 288 (Tex. 1978).

The purported evidence of an agreement to share profits cited by Mendoza consisted of deposition testimony from a Stone salesman that Stone was "in the business of making a profit" while Panhandle most likely "share[d] that interest in making a profit." From that testimony, Mendoza hypothesizes that "[t]here is a fact issue on whether there was an agreement to share profits." Such a generic statement as "being in the business of making a profit" says little, as does the suggestion that some other entity may share a similar interest. Theoretically, all legitimate businesses are in the business of making a profit, and simply because two independent entities (like Stone and Panhandle) have such a common interest and transact business with each other does mean that they agreed to share their profits with each other. To conclude otherwise is illogical.

11

The profits contemplated in a joint venture are the profits earned by the venture itself. For instance, if a slab of granite consigned by Stone were sold by Panhandle for $100 and the expenses of selling that slab were $50, then the profit would be $50. *See Martin v. Davis*, 552 S.W.2d 873, 878 (Tex. App.—San Antonio 1977, writ ref'd) (defining "profit" as generally meaning that which remains of the gross receipts of the business after all legitimate expenses have been deducted). So, for there to be a joint venture regarding the sale of that granite, there must be evidence that the two independent entities agreed, in some manner, to share that particular $50 profit. Mendoza cites us to no evidence indicating (or from which one could reasonably infer) that Stone and Panhandle agreed to share in any amount of money left from the sale of consigned granite once the expenses of selling that granite were deducted. Nor did we encounter such evidence. At best, the record indicates that Panhandle would send money to Stone once the product was sold, but the money it sent was the price set by Stone in the invoice that accompanied the delivery. In other words, Panhandle was paying Stone for the consigned granite sold, it was not sharing profits.

Similarly absent is any evidence of an agreement to share losses. According to the record, if the product consigned by Stone were damaged while in the possession of Panhandle, the latter was liable for the loss. If the product was not sold, then Stone bore the loss of the returned product. And, contrary to the suggestion of Mendoza, the fact that Panhandle may have sought a "discount" on the product damaged when it fell on Pham is inconsequential. Anyone can ask for a discount. It is the right to receive one that may have some import, and Mendoza cites us to nothing indicating that Panhandle was entitled to receive a discount from Stone when paying for the product it

(Panhandle) damaged. Indeed, according to the record before us, Panhandle paid for the granite damaged in the incident.

Without evidence of an agreement to share profits and losses, there was no joint venture. We neither found such evidence nor were we cited to any. Consequently, we overrule the contention that the trial court erred in granting summary judgment adversely to Mendoza upon the allegation of joint venture.

*b. Enterprise*

Regarding the matter of joint enterprise, Stone and Hopper averred that Mendoza brought forth "no evidence on any of the required elements. . . ." Before us, she contends that Stone "did not conclusively negate any element of [her] joint enterprise theory." We disagree with the proposition that the record contains evidence sufficient to create a material issue of fact on the existence of a joint enterprise between Stone, Panhandle and Hopper.

For there to be a joint enterprise all parties to it must: "(1) agree to a common purpose; (2) have a community of pecuniary interest in *that* common purpose; and (3) have an equal right of control over the enterprise or project formed to carry out that purpose." *St. Joseph Hosp. v. Wolff*, 94 S.W.3d at 528 (emphasis in original). It is not enough to simply prove that the parties have a common business or pecuniary interest. *Id.* at 527-28. Rather, the pecuniary interest must "be common among the members of the group—it must be 'shared without special or distinguishing characteristics.'" *Id.* at 531, *quoting*, *Ely v. General Motors Corp.*, 927 S.W.2d 774 (Tex. App.—Texarkana 1996, writ denied); *Kimbrell v. Memorial Hermann Hosp. Sys.*, 407 S.W.3d 871, 877-78 (Tex. App.—Houston [14th Dist.] 2013, no pet.); *Toledo v. Silver Eagle Distr., L.P.*, No. 01-11-00488-CV, 2013 Tex. App. LEXIS 172, at *15-17 (Tex. App.—Houston [1st Dist.]

13

January 10, 2013, no pet.) (mem. op.).   Examples of such "special or distinguishing characteristics" that defeat the requisite community include 1) no sharing of income, *e.g. St. Joseph Hosp. v. Wolff*, 94 S.W.3d at 531-32 (rejecting the contention that there existed a community of pecuniary interest in the common purpose because there was "no evidence in the record that St. Joseph agreed to share with the Foundation any money it received from operating the general surgery residency program"), 2) receiving a fixed payment for a product sold by another, *Toledo v. Silver Eagle Distr. L.P.*, 2013 Tex. App. LEXIS 172, at *15-16 (wherein Silver Eagle was a distributor of beer and received payment based on how much beer Aramark directed it to deliver); *Ely v. General Motors Corp*, 927 S.W.2d at 977 (wherein a wholesaler sells to a retailer), and 3) arrangements where one member of the group receives the profit of a sale after paying the other member a percentage of the sale irrespective of expense.  *Harris v. Houston Livestok Show & Rodeo, Inc.*, 365 S.W.3d 28, 35 (Tex. App.—Houston [1st Dist.] 2011, pet. denied).

Here, we have been cited to no authority holding a consignment relationship to be a joint enterprise.  Nor did we find any.  Similarly missing is evidence of record that Stone and Panhandle shared the income from the sale of granite as contemplated by a joint enterprise.  As previously described, some money from the sale of consigned product would be sent to Stone by Panhandle once the product sold.  Yet, the share would be the invoice price established by Stone.  Panhandle was free to set the price at which the product was sold; it could sell it at a loss if it so chose.  Yet, irrespective of the price at which it was sold, Stone was entitled to the invoice price.[5]   So Stone and

_____

[5] Indeed, if the product was damaged, as it was here, Stone still received payment.  In such circumstances, Panhandle was left having to recoup its loss elsewhere.  It did that here by submitting an insurance claim.

Panhandle were not sharing income. Instead, their relationship had indicia akin to that of a wholesaler or supplier delivering product to a retailer.

As said in *St. Joseph*, "a franchisor, wholesaler, or supplier usually does not have a 'community of pecuniary interest' in the retail sales of its respective franchisees, retailers, or customers." *St. Joseph Hosp. v. Wolff*, 94 S.W.2d at 528. "Although the former entities stand to benefit financially from the successful downstream marketing of their goods or services, their interest in those activities are not held in 'community' with the members of the latter group because they are not shared 'without special or distinguishing characteristics.'" *Id.* Stone being a supplier of granite and entitled to payment at the price specified in its invoice even if the product were damaged or sold at a loss, its arrangement with Panhandle was not free of special or distinguishing characteristics. That made their consignor/consignee relationship something other than a joint enterprise. And because no material issue of fact appears of record regarding the existence of a community of pecuniary interest, we cannot say that the trial court erred in granting Stone and Hopper a summary judgment on the claim.

The summary judgment is affirmed.


Brian Quinn
Chief Justice


15